THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* SAMUEL H. EVANS, Appellant.

Second Department, November 2, 1928.

*Paul Abbott* [*Arthur N. Seiff* with him on the brief], for the appellant.

*Philip Huntington, Assistant District Attorney* [*Elvin N. Edwards, District Attorney*, with him on the brief], for the respondent.

RICH, J. The defendant has been convicted of the crime of grand larceny in the second degree. He is charged, in substance,

with obtaining from one William Ring, on June 29, 1927, a steam boiler of the value of $350, by the making and delivering of a check for $1,000, knowing at the time that there were not sufficient funds to his credit in the bank upon which the check was drawn for its payment.

The defendant, a builder, operating under the name of Sam Evans, Inc., was engaged at the time of the delivery of the check in the construction of a house at Great Neck, Nassau county, N. Y. He had contracted on May 25, 1927, with one Ring for the furnishing and installing of heating and plumbing fixtures in the premises. The contract among other things provided for the payment of about $1,300 upon the installation of roughing, and the setting of the tubs and boiler.

Ring, the complaining witness, testified that early in June, 1927, defendant requested that he install the boiler. This he testified he declined to do unless defendant paid for the boiler and for the work already performed. He says that the defendant thereupon agreed to deliver a check for $1,000, to be applied on account of the boiler and of the roughing payment. He delivered the boiler on June 29, 1927, and received that day from defendant the check in question, which was subsequently dishonored. The workman who installed the boiler testified that it was done on June twenty-ninth, and that prior thereto it had been in the yard of the complaining witness. This constitutes substantially all of the evidence tending to connect the defendant with the crime charged.

The question before us for determination relates to whether or not the check was given, as claimed by the complainant, to pay for the boiler, or whether, as claimed by the defendant, it was given to the complainant and received by him as a post-dated check for his accommodation, to be applied on the first payment due under the contract. Upon the controversy presented by this issue, the defendant testified: " Q. Tell us what conversation you had with Mr. Ring which led you to give him this check for a thousand dollars? A. Well, Mr. Ring came in on the 29th and wanted to know if he could get a payment. I said: ' Mr. Ring, I am getting my first payment on the 1st from the Finance Company and that day I will give you a check,' but he said: ' I want the check today because I am going away on my vacation over the 4th of July, and I want to use the money;' and I told him particularly at that time that there wasn't any money in the bank, that he couldn't use it. I assumed at that time he was banking in the same bank I was, and when he accepted that check he knew at the time there was no money. Q. Did he tell you he was in the same bank you were in? A. No. Q. What did he say about that? A. He said

he banked in the Bank of Great Neck, and that the check would not come through to my bank for two or three days after he deposited it, but he accepted the check knowing that there was no money to meet it, because I was getting my payment on the 1st of July from the Finance Company." He testified that the boiler was at the premises on June 16, 1927, and denied he had any conversation with the complaining witness in which the latter had refused to deliver the boiler unless he paid $1,000. Besides, he said that the complaining witness was not entitled to the first payment until after he had installed the boiler. A carpenter employed at the premises testified the boiler was there in the early part of June; a salesman for the United States Radiator Corporation testified to its presence there the early part of June; the witness Hendrickson said he saw it there on June sixteenth, while the witness Tigar said he saw it there during the second week in June. Upon the motion for a new trial, one John Traynor made affidavits both for the prosecution and the defendant, and it appears therefrom that he and one Rathbun installed the boiler, and that the witness Dennelly, who testified he installed it, had no part in this work. Traynor fixes the time of the installation as prior to the time when the water was installed, which appears to have been on June sixteenth. Finally, it appears that the receipt for the boiler, while calling for its delivery to defendant's property, was admittedly altered three weeks prior to the trial by the representative of the plumbing house so as to read: " Delivered to Ring's residence 19 Brewer Ave."

It seems that defendant was disappointed in obtaining sufficient funds with which to meet the check, the title company not having advanced him the amount he expected. The prosecution not only failed to establish the guilt of the defendant beyond a reasonable doubt, but the preponderance of the evidence conclusively shows the defendant to be innocent of the crime charged against him; but this is not all. The defendant claims further, and I think with reason, that he did not receive a fair trial.

The assistant district attorney in cross-examining the defendant was permitted to interrogate him upon collateral matters which the jury had no right to consider in arriving at their verdict. For instance, the district attorney asked him: " Q. And you are not a citizen yet? A. No. Q. Have you ever tried to be? A. Yes. Q. Why did you fail to become one? A. Because the man that had my second papers died the time I was getting ready for it. Q. How long ago was that? A. 1920. Q. Did you start over again? A. No." Of what interest was it to determine the question as to whether defendant was a citizen of the United States? Surely it

cannot be claimed that he was not entitled to the same credit that would be extended to one of our citizens; nor can it be claimed that the same protection should not be thrown about an alien as is extended to citizens accused of crime. " Q. Now, how much did you owe creditors when you left Great Neck on July 5, 1928? Mr. Abbott: That I object to, if your Honor please, as immaterial, incompetent and not involved in this issue here. The Court: It is cross-examination. I will allow him some leeway. By Mr. Spoor: Q. What were your obligations? A. I don't know, I can't remember now. * * * Q. Why didn't you stay around Great Neck and liquidate that equity and pay your honest debts instead of going west? Mr. Abbott: I object to that, if your Honor pleases, as not a proper question. The Court: Objection overruled. Mr. Abbott: Exception. A. I couldn't say. * * * Q. Did you go into bankruptcy? A. No. Q. Well, in 1926, there was some sort of crisis or crash in your life financially, wasn't there? A. No. Q. And there were judgments taken against you? A. Yes. Q. A number of them, weren't there? A. Yes. * * * Q. Now, isn't it a fact that you took twenty-one hundred dollars of your son John's savings with you and as a result of that he was so depressed he committed suicide? A. No. Mr. Abbott: If your Honor please, I object to the question unless the District Attorney — The Court: Objection overruled." There is no justification for this question and it seems inexcusable. " Q. And you never paid those judgment creditors? A. No. Q. Is that your idea of honesty? A. No, I am getting that cleared up now. Q. Oh, you are? A. That is what I called them for. * * * Q. Who was the woman that went with you as far as Chicago? Mr. Abbott: I make the same objection, if your Honor please, to the form of the question, unless the District Attorney says that he intends to offer evidence along that line. The question is to create an atmosphere in the minds of the jurors as to the defendant having run away. Unless the District Attorney intends to prove that charge, I say the question is objectionable. The Court: He is not bound to prove any charge. Mr. Abbott: Well, I object to the form of the question. The Court: He has a right to ask any question that relates to his past conduct. Mr. Abbott: He has assumed in his question that that is a fact. The Court: He has a perfect right to do that. Mr. Abbott: I asked him to make a statement if he intends to prove that. The Court: No, he is not obliged to make a statement. By Mr. Spoor: Q. Who was the woman that started out with you? A. I never had a woman with me. Q. Who was the woman with you in Chicago? A. I never had a woman in Chicago, or any part of the journey."

While great latitude is extended to the prosecutor in the cross-examination of a witness accused of crime, and the questions would have been proper if there had been any reasonable ground to ask them, yet the record is barren of any evidence from which these queries could have been justified, and as the only object seems to have been to prejudice the defendant, it is our duty to consider them in arriving at the conclusion as to whether the defendant was accorded a fair trial. In view of the conclusion we have reached in regard to the main issue, however, the discussion of the question as to whether the defendant was given a fair trial is not necessary, but it might be well to remind the learned prosecutor that the rights of persons accused of crime cannot be disregarded.

The judgment of conviction should, therefore, be reversed and a new trial granted.

SEEGER and SCUDDER, JJ., concur; LAZANSKY, P. J., and YOUNG, J., concur in result, upon the ground that defendant was not accorded a fair trial.

Judgment of conviction of the County Court of Nassau county reversed upon the law and the facts and a new trial ordered.